Earl v. Good Samaritan Hospital, case number 222505 It's good to be back. Okay, so this is also an appeal from Rule 12. This is Americans with Disabilities, Reasonable Accommodations. I guess there are two major issues here. I'm administrative remedies. District Court said the plaintiff didn't get a right to sue, but the complaint says there's a right to sue. So drawing inference is favorable to Earl. He exhausted administrative remedies. I don't know if that's seriously contested. The other issue which is contested is whether the plaintiff had a cognizable disability during the time he worked for the certainly could be clearer, but if you really map it out into a timeline, you can see that the plaintiff's conditions, sleeping, mental clarity, digestion, breathing, loss of smell, all of that happened when he got COVID. When did he get COVID? It appears from the complaint he got COVID during the early days back in April. April 7th, he returns to work. He had tested positive for weeks. With respect to all the disabilities asserted in the complaint, he alleges that all of it happened since he got COVID. So the inference, drawing the inference favorable to plaintiff is that he alleges that all of this amounts to a disability because he had a kidney condition, pre-existing condition. Well, he had a kidney condition. He's always had a kidney condition, but he also said that since he got COVID, meaning the inferences while he was still working for the hospital, he had a sleep condition from COVID. He had mental clarity, brain fog conditions, digestion, inability to smell and taste. District Court said, well, that sounds like long-term COVID conditions, not necessarily something which he endured when he was working for the hospital, but if he claims that these conditions materialized as soon as he got COVID, which they would, then during the time he was working for the hospital. How is his inability to smell or taste affect his ability, constituted disability affecting his work? Well, it affects... It may affect lunchtime, but it's not going to affect the time that he's actually... Well, it's a disability because it affects his ability to eat. He can't taste anything. And he, the couldn't taste that it was rancid. But I guess how did the requested accommodations causally connected to the purported disability, right? So I get it. Let's say that it's a disability, right? I can't taste. They're not giving him... He's not requested an accommodation that's going to help him taste or an accommodation that will take him away from job requirements that require smell or taste and into job requirements that don't require smell or taste. It seems like there's a mismatch here. Well, he doesn't want to be exposed to any more COVID. But that's different, right? I mean, he's already lost his smell and taste. So I don't see the connection there. Well, can't the condition get worse? I mean, he also has a kidney condition, which... Well, but that could also... That could be true of anybody, right? I mean, I could not have a disability and I don't want to catch COVID. Why does he have a desire not to be exposed to whatever, say COVID, that is any different, materially different from any other human being who doesn't want to lose their smell and taste to begin with? Because the kidneys make him more vulnerable to serious illness because of his kidneys as compared to somebody who doesn't have a kidney condition, right? But if he comes back and he's already got these COVID conditions, he doesn't want to be exposed to anything that's going to either reinfect him because there was no vaccine at the time. And that's, you know, he's already vulnerable. If he's already lost his sense of smell, his sense of... His sleeping ability is impaired. That can always get worse. But is that true that if you've got it, you're more vulnerable? Is there some showing that he's more vulnerable? He could get COVID again and it could make a bad situation worse. But how is that different from making a good situation bad? Because he's already disabled now. He already has these conditions. I don't want it to get worse. I'm vulnerable to something worse. COVID was still new. And his disability makes him more vulnerable? The existing COVID conditions could make him more vulnerable. It can always get worse, right? No, no, but two different things, right? It can always get worse. It's true. That's true of everybody. But I guess I'm looking at the causal connection. Why is it or what's in the record that shows that his existing conditions, the lack of smell and taste, whatever, make him more susceptible to getting worse than other people to getting worse? Because I'm not aware. I wasn't aware, I don't think, of that being a true statement, that he is now more likely to contract a condition than other people because he had it before. I think there was a fear that it can get worse. And I think that's rational if you're coming back from early COVID and you have all these impairments. You don't want to be exposed to COVID again. And the kidneys. Well, the want is not the disability, right? The want or the fear is not a disability, right? Someone who's more subjectively afraid of a condition doesn't make them more vulnerable to the condition. I get it if you're immunocompromised, right? And you say, look, I have a condition that makes it 80% more likely for me to get this disease than the normal populace. Well, then that's the kidneys. Because the kidneys are, he's put at risk. He's been fighting chronic kidney disease since birth. As I understand it, but may I ask a question? As I understand it, the term disability under both the ADA and Section 504A constitutes two ideas. One is an impairment, a physical impairment, a mental impairment. And the second component of that is that it's an impairment that substantially limits your ability to do whatever, engage in some major life activity. Is that correct? Correct. Another requirement under both the ADA and Section 504A is that the employer has some notice of the disability. Is that also correct? Correct. Okay. And as I understand it, one argument, even if we assume that you've adequately alleged a disability, understanding as you pointed out that it's not clearly, it's not all that clear, but even if we assume that, there are new allegations that the hospital here had notice of the disability. There are. Would you point here? Yes. Would you point out those allegations? Paragraph 60, page 38. What does it say? That's, he came back to work to the command center. He said, it's my first night back and I've been infected. He told that to the command center. Paragraph 66. Sure. I've been infected already. So, maybe I should have been myself a little bit more precise. There's COVID and then there are the specific impairments that are associated with COVID. And I think that what we're really talking about and what you've been arguing about and what you're claiming is that the impairments associated or arising, associated with or arising from COVID are the impairments that we should focus on. So, the fact that I tell you that I've got COVID, that I'm generally infected, doesn't tell you that I've got specific impairments that arise from that. And as we all now unfortunately know, different people have very different reactions to being infected by COVID. So, where in the complaint is it alleged that the hospital was notified of the specific impairments that prevented him from doing the job? You mean like taste or sleep or fatigue? Apart from the kidneys, because there is an allegation. He told somebody. The kidneys, okay. He told somebody. In terms of COVID. The COVID disabilities? No, it's not clear in the complaint that he specifically said, I've lost my sense of taste. I can't sleep, all that. But I think we can, and I know I'm on thin ice when I say something like this on a Rule 12. I think we can assume in April 2020, COVID was really strong back then. And when you got COVID, that was considered a serious health condition. The ice is cracking. We know that when you get COVID back then, you didn't recover right away. And, you know, if you said to somebody, if somebody said to you in April 2020, I just got tested for COVID, you'd know something is seriously wrong with him physically. Because COVID was so strong back then. But if that answer doesn't suffice, we still have the kidneys. And he told them, I have a kidney condition, and I'm hearing terrible things about what happens when you have a kidney condition in COVID. And then we get into reasonable accommodations. None of this came up in this Rule 12 decision, but I thought you would ask. There was a series of events here where he requested less risky jobs. Put me in the clean unit. They didn't put him in the clean unit. When he resigned, he told a high ranking chief nursing officer, same thing. I want a PAPR. It doesn't cost that much money. You can afford one. Put me in a clean unit. No response from her. So that's the reasonable accommodation denial, if you're looking for that. You've reserved some time for rebuttal, I think. Correct. Thank you. We'll hear from your friend on the other side. Good morning, your honors. May it please the court. May it please opposing counsel. I'm Brian Clark from the firm Venable here on behalf of Apelli Good Samaritan Hospital. A number of things. First, ironically, he got COVID, recovered. He was a young man in his 20s. So he was probably less likely to get infected or to have serious implications than the other health care workers. Also, he was an ICU nurse. April 2020, ICU was ground zero. He wants to be transferred out. But one, in terms of what he was affected by during his employment, there's a very short time frame. The individual got COVID. He was given leave. He recovered. He went through quarantine. The complaint says, I felt well enough to return to work. He worked two days, and then he quit. So he throws on the wall all these symptoms of long-term COVID, which, by definition, takes place well after getting COVID. So there can be no inference that any of these conditions took place in his brief window of a new return to employment. Also, in regards to that, he was offered reasonable accommodation, and he abandoned the interactive process. He asked for a PAPR, right? You can look it up, Your Honors. It's a combo between a World War I gas mask and a space helmet. He was offered an N95 mask. If you recall, and again, this counsel did not draft the complaint. It was a prior counsel? Hard to get. And yes, it was being rationed by the state. It was the gold standard for COVID protection. What is of great significance is if you really focus on the wording of the complaint, right? There's a motion to dismiss. Joint Appendix 81 to 84, Paragraph 67 to 85. Second day back from work, conversation with the supervisor. The N95 mask doesn't fit. The fit process is so no particles will get in. They fit it, make sure it fits, there's no gaps. They spray things on it and see if you can taste the smell. The supervisor says, and these are his allegations, I thought you were fit tested yesterday. He then says, not him, another nurse present says, what about a PAPR? His supervisor says, we don't have any. In fact, there's another conversation with the director of nursing who says we also don't have the cartridges, which you have to use like every hour, which cost over 100 bucks. So the supervisor responds, we don't have PAPR. And says, we need to find something else that will still work. Get fit tested again. And he's not even saying the N95 mask is not a reasonable accommodation. All he's saying is it doesn't fit. And the supervisor says, get fit tested again. And then he says, another nurse says, go to a clean unit. His supervisor quite correctly said, he's a critical care nurse. This is April 2020. Councilman, can I maybe just ask you, because we have limited time. Yeah. Just shift your attention to a preliminary procedural issue. First of all, tell me, my understanding of the district court's decision is it rejected or dismissed the ADA claim on the basis of failure to exhaust. Is that correct, that that's what the district court did? That is correct, even though in addressing the rehab act claim, which as we argue, it's the same standard, so it should be equally applicable. But yes, it's correct. Let's take that for a moment. And am I also correct that the district court did that to respond to it? Basically not because you raised that as a defense. Is that also accurate? That is correct. We raised it because the pleading was insufficient. And it was a motion to dismiss. We didn't know. Because as we raised a number of times with two motions and in addition to pre-motion letters, we never received either an EEOC charge or a right to sue letter. So my question there is, did the district court err in dismissing it because of the, on the grounds that the plaintiff had failed to affirmatively plead exhaustion? Was that error, the way it was framed? Not to say that you couldn't raise it as a defense and perhaps win on it, but was it error on the district court's part to say that the plaintiff lost on that particular count because of a failure to plead exhaustion? So there's two things, Your Honor. One, their argument is we waived. And we admitted that we did. But that is not- No, the court has within its power to make that judgment sua sponte. And the allegations do not meet the requisite pleading standard to show- The district court has the right to sua sponte dismiss for failure to exhaust? Is that your- Yes, that's correct, Your Honor. How is that different from requiring a plaintiff to plead exhaustion? How is that- Is that the same thing? No, and I might be misreading. I mean, the court's point, and again, we had raised, we can't raise any defense to this at this juncture because we don't, the complaint does not sufficiently plead what happened. Because remember, our defenses to an underlying charge in the right to sue letter would be what's being alleged in the complaint is not in the underlying charge or that you did not file the complaint within 90 days of the right to sue being issued. And the complaint failed to provide that information, which is what the court pointed at. Typically or ordinarily, in our case law, who has the burden of alleging a failure to exhaust? Is it the plaintiff or the defendant? Well, again, two things on that, Your Honor. Normally, commonly, the right to sue is attached to the complaint one. But no, it's the burden is on the defendant. And we didn't move precisely for that reason. We didn't have sufficient allegations to respond. And just to follow up on Judge Nardini's question, if you didn't move, then at the very least, wasn't it incumbent on the district court judge to provide some notice that he was going to consider the failure to exhaust, right or wrong, before doing so, sui sponte? And again, Your Honor, there was a- And my question is focused on- Yeah. And again, Your Honor, this prior attorney was involved. I wish the judge had been more expansive in his decision. Not in the record. There had been a conference at one point where the judge had pressed the prior attorney, but- Would you answer Judge Nardini's question? Sure. Was it an error, given the fact that the burden rested with you? Forget about who was- Correct. Where, that it rested with you to show the failure to exhaust. Was it an error for the district court to rule on that basis without providing any notice? It's okay if- No, no, no. And again, I would say, and I understand we're on appeal. There were, not in the record, but in conferences, it's discussed. No, I would say it would be within the court's discretion to decide sui sponte. It's okay. Oh, so you think it was not an error. All right. So let me just ask this, though. Isn't exhaustion, administrative exhaustion, let's start, number one, it's a defense, right? Correct. It's a precondition. Number two, because it's a defense, it's a waivable defense, right? So in a different case, let's hypothesize completely different litigants. So nobody's faulting anybody in this litigation for raising or not raising something. You could see a case where it goes all the way through summary judgment. The defendant never mentions the word exhaustion. And that would properly be deemed a waived defense on the part of the defendant, right? I would agree, Your Honor. Again, different case. I'm not acknowledging it here. No, I agree. I would agree with that, Your Honor. So I guess then my question is, how is it appropriate for a district court to raise its sui sponte if it's not raised by the defense? I mean, you could have, I assume, let's say you hadn't won at this stage of the game. Case had progressed. You could have, at some appropriate juncture, with some additional development of the record, perhaps limited discovery on the question of exhaustion, said, well, look, Your Honor, we think there's probably no exhaustion here. I'd like a little bit of discovery just to focus on that for purposes of efficiency. And then we'll file our motion to dismiss based on a lack of exhaustion, right? You could have saved litigation costs but still moved ahead. I guess given those possibilities, why was it appropriate then for the district court to sui sponte raise a waivable defense on the part of the defendant? Well, one, we had provided notice because we had raised, at a minimum, in our two motions to dismiss, there were three bites at the sapple, the amended complaint and the second amended complaint. We raised it that the pleadings were vague and we didn't know- Okay, but you didn't raise it as a defense, you just said- No, that's right, because we didn't know enough to, there wasn't enough to raise it. Okay, so that's point one. Correct. And you said there are multiple points on this? Or maybe not, maybe I missed something. No, no, not on this. But again, but that's why we didn't move, Your Honor, is there wasn't enough in the complaint for us to move on. And that's why we raised it. It's vague and it's insufficient, so we don't know. And our client has not gotten these papers. And in any event, you're relying on the merits and you- That is, thank you very much, that is your honor. Thank you so much. Okay. We'll hear from Mr. Bercy. Thank you. Yeah, the issue of how long he worked for the hospital after he got COVID, I don't think it's accurate to say on the face of this complaint that he only worked two days and then quit. He did get two weeks notice. When did the impairments start to manifest? Was it before or after? He, let's see. And when would I look to confirm? Here's how I can best construct the timeline. He went into isolation for three weeks. It's paragraph 61 to 65. That was in March of 2020. April 7, he comes back to work. That's paragraph 65. He had tested positive for COVID. April 8 is when he goes to the fit testing station, and that's when you have the exchange about, weren't you fit tested? What games are you playing? Things like that. I want a mask that fits. That's the timeline. The resignation letter is April 8th, right? He says, I'm giving two weeks notice. I'm unwilling to get reinfected. That is the best I can discern from the allegations. So it's a fair reading that the impairments manifest thereafter, after April 8th? After when? April 8th. No, the fair reading is that, according to the complaint, the impairments manifested as soon as he got COVID. Because in each allegation in the complaint, when he talks about these impairments, we see the same language. Since he got COVID, things like, you know, he couldn't sleep. Since he got COVID, he couldn't digest. So the assumption, well, the allegation is it came immediately, that he was living with these conditions. How do you know you have long COVID unless you wait to find out? Well, you wouldn't. And I don't think we even knew about long COVID at the time. But he certainly. I mean, such a thing as short COVID, too. Right, we didn't know. Hadn't been around long enough. But he certainly knew, like, I'm not going through this. You know, what if I get it again? And what about my kidneys? You know, I don't want my kidney condition to make things worse. There was some mention about reasonable accommodations, the clean unit, a less dangerous assignment. And the response was, well, you're a critical care nurse. The assumption is we can't send you to a unit that, you know, is not your unit. But on Rule 12, we can't just assume that that's not the right place for him at a time like this, that you can move people around. That's really an issue for discovery. So for these reasons, we think the score should reverse. Thank you. Thank you very much for your time. Let's proceed.